# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANASH, INC., d/b/a WYOMING VALLEY YESHIVA, and SHIMON HELLINGER, *individually and in his capacity as an authorized representative of Wyoming Valley Yeshiva and relevant community members*,<br><br>Plaintiffs<br><br>v.<br><br>BOROUGH OF KINGSTON, et al.,<br><br>Defendants. | CIVIL ACTION NO. 3:24-CV-01955<br><br>(MEHALCHICK, J.) |

## MEMORANDUM

Before the Court is a motion containing a request for a preliminary injunction, filed by filed by Plaintiffs Anash, Inc., ("Anash") d/b/a Wyoming Valley Yeshiva ("Wyoming Valley Yeshiva"), and Shimon Hellinger ("Rabbi Hellinger"), individually and in his capacity as an authorized representative of Wyoming Valley Yeshiva, and relevant community members (collectively, "Plaintiffs") on December 2, 2024, together with a brief in support of the motion. (Doc. 5; Doc. 6). This case stems from Plaintiffs' opposition to the condemnation of Plaintiffs' properties located at 44 Pierce Street ("44 Pierce") and 239 Pierce Street ("239 Pierce") (collectively, the "Properties") in the Borough of Kingston. Defendants are the Borough of Kingston ("Borough"), David R. Yefko ("Yefko"), and Robert Suchoski's ("Suchoski") (collectively, "Defendants"). The Properties were used by Plaintiffs for Orthodox Jewish religious activities. (Doc. 6, at 6). Plaintiffs seek a preliminary injunction prohibiting Defendants from continuing to restrict access to the Properties, to reverse the condemnation of the Properties, and invalidate the zoning ordinance at issue. (Doc. 6, at 27).

I.    FACTUAL AND PROCEDURAL BACKGROUND

Rabbi Hellinger is the owner of the Properties and also acts as a religious leader for members of the Wyoming Valley Yeshiva and as an authorized agent for the nonprofit corporation, Anash, Inc., d/b/a Wyoming Valley Yeshiva. (Doc. 1, ¶¶ 6-7). In late 2020, Rabbi Hellinger purchased both Properties. (Doc. 16-11). Kingston Borough's 2023 Zoning Ordinance ("Zoning Ordinance") sets forth the local zoning laws where the Properties are located. *See* KINGSTON, PA., ZONING ORDINANCE (2023). 44 Pierce is located in a C-2 Zone, meaning that the area is zoned for commercial use, and at the time of purchase by Rabbi Hellinger, was used as an office, a use Rabbi Hellinger represented he would continue. (Doc. 1-1; Doc. 16-11, at 2-3). 239 Pierce is similarly located in a C-2 Zone, and at the time of purchase by Rabbi Hellinger, was used as a single-family home.[1] Like with 44 Pierce, Rabbi Hellinger represented that he would continue to use 239 Pierce in this manner, as a single-family home. (Doc. 1-2; Doc. 16-11, at 4). The conditional approval certificates for the purchase of both Properties noted that any changes in occupancy or use of the Properties would render the approval null and void. (Doc. 1-1; Doc. 1-2; Doc. 16-11, at 3-4).

Following the purchase of both Properties, Rabbi Hellinger began to use 44 Pierce as his personal office, as well as a "yeshiva," defined roughly by Plaintiffs during the December 12, 2024 hearing, as well as in their complaint, as a place of study. (Doc. 1, ¶ 24). Photos of the yeshiva provided by the parties as exhibits, as well as provided on the Anash website,

---

[1] When Rabbi Hellinger purchased 239 Pierce, it was being used as a single-family home in a C-2 district. (Doc. 19, at 98). As a single-family home in a commercial district, there was a pre-existing non-conforming use designation associated with 239 Pierce. (Doc. 19, at 98). Attorney Mattern, Kingston's Solicitor, testified that this pre-existing non-confirming use designation means that its continued use as a residential single-family home in a C-2 district would have been permitted. (Doc. 19, at 98).

show that the yeshiva included desks, books, whiteboards, and other materials typically used in educational facilities. (Doc. 16-5, at 2; Doc. 16-12; Doc. 16-19). Further, Plaintiffs advertised the yeshiva on a website that included Rabbi Hellinger's name and contact information. (Doc. 16-2; Doc. 16-3; Doc. 16-4; Doc. 16-5). On the website, Plaintiffs described the yeshiva as a "program" for students seeking to "reach new heights in learning" and who "want to advance in substantial learning." (Doc. 16-3, at 1-4). The website further describes staff as "teachers." (Doc. 16-4, at 2; Doc. 16-5, at 3). Plaintiffs also began to use 239 Pierce as a housing facility for individuals attending the yeshiva. (Doc. 6, at 7). The website advertises housing for students and includes photographs of beds and what appear to be dorm rooms. (Doc. 16-2; Doc. 16-3; Doc. 16-4; Doc. 16-5). Plaintiffs testified that the application to the yeshiva also refers to students and teachers. (Doc. 19, at 61).

Beginning in the fall of 2023 and into 2024, Defendants submit that they began to receive complaints from neighbors. (Doc. 16, at 6; Doc. 16-6, at 2). On several occasions between September 2023 and March 2024, Defendants informed Plaintiffs of the complaints and that their use of the Properties as a yeshiva and/or dormitory was unlawful. (Doc. 16-6, at 2; Doc. 16-7, at 2-3; Doc. 16-8, at 2-4; Doc. 16-10). Defendants communicated both directly with Plaintiffs and with Plaintiffs' former and current attorneys to explain the unlawful usage. (Doc. 16-6, at 2; Doc. 16-7, at 2-3; Doc. 16-8, at 2-4; Doc. 16-10). On April 4, 2024, Yefko sent Rabbi Hellinger a violation notice informing Rabbi Hellinger that using 239 Pierce as a boarding facility is illegal under the 2023 Zoning Ordinance. (Doc. 1-6, at 2; Doc. 16-16). April 11, 2024, Yefko sent Rabbi Hellinger a violation notice informing Rabbi Hellinger that using 44 Pierce as a school violates the relevant Zoning Ordinance. (Doc. 1-3; Doc. 16-13). The notice violations do not include information about how to appeal the "school" or

"boarding house"/"dormitory" designations but do provide instructions on how to apply for relief via a variance, such as a Conditional Use or Special Exception permit. (Doc. 1-3, at 2-3; Doc. 1-6, at 2). On August 22, 2024, Yefko sent Rabbi Hellinger a second notice of violation for each property, both of which included the same information as the first notices and expressed frustration that Rabbi Hellinger had not communicated or replied to Defendants' letters, notices, or other communications. (Doc. 1-4; Doc. 1-7; Doc. 16-15; Doc. 16-17).

On October 1, 2024, due to ongoing health and safety concerns at the Properties, and Plaintiffs' failure to respond to the violation notices, Defendants applied for administrative search warrants, which were approved by Magisterial District Court Judge James Tupper. (Doc. 1-9; Doc. 1-10; Doc. 1-13; Doc. 1-14; Doc. 16-14). On the same day, Defendants searched the Properties, determined that the safety concerns were well-founded, and posted signs to both Properties declaring the Properties unsafe for human occupancy and informing occupants that it would be unlawful to enter after 6:00 PM. (Doc. 1-11, at 2-3; Doc. 1-15, at 2; Doc. 1-16).

On November 13, 2024, Plaintiffs filed a complaint in this Court asserting 21 causes of action alleging religious discrimination/religious freedom violations and due process violations, as well as state law violations related to the condemnation of the Properties. (Doc. 1). Plaintiffs then filed a motion for a temporary restraining order ("TRO") and preliminary injunction, along with a brief in support, on December 2, 2024. (Doc. 6). This Court denied the request for a TRO on December 6, 2024. (Doc. 8). On December 12, 2024, Defendants submitted their brief in opposition to Plaintiffs' motion. (Doc. 16). A hearing on the motion for preliminary injunction was held on December 12, 2024. The motion is thus ripe for disposition. (Doc. 1; Doc. 6; Doc. 8; Doc. 16).

## II.  PRELIMINARY INJUNCTION STANDARD

Four factors govern a district court's decision in issuing a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *Grill v. Aversa*, 908 F. Supp. 2d 573, 591 (M.D. Pa. 2012); *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985)); *see also Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170–71 (3d Cir. 2001).

A preliminary injunction is an extraordinary in nature and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion, and one that should issue only in limited circumstances. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994). In order to satisfy this exacting standard, the party moving for a preliminary injunction must carry its burden of demonstrating both: (1) likelihood of success on the merits; and (2) the existence of irreparable injury from the alleged misconduct. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir.1989). If the movant fails to carry this burden on these two elements, the motion should be denied since a party seeking such relief must "demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989) (emphasis in original) (*quoting Morton v. Beyer*, 822 F.2d 364 (3d Cir.1987)). Given the extraordinary nature of this form of relief, a motion for preliminary injunction places precise burdens on the moving party.

As a threshold matter, it is a movant's burden to show that the "preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir.1992) (emphasis in original, citations omitted). Therefore, "upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir.1937). A preliminary injunction "may not be used simply to eliminate a possibility of a remote future injury." *Holiday Inns of Am., Inc. v. B&B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969). "[T]he irreparable harm must be actual and imminent, not merely speculative." *Angstadt ex rel. Angstadt v. Midd-West Sch.*, 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). "[M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat . . . .'" *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (citations omitted). "A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm." *Fisher v. Goord*, 981 F. Supp. 140, 168 (W.D.N.Y. 1997) (emphasis in original). Thus, the relevant inquiry is whether the party moving for injunctive relief is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued.

Moreover, "[t]he 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797,

801 (3d Cir. 1989) (emphasis added). "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for ...'." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (citations omitted). If the record does not support a finding of both irreparable injury and a likelihood of success on the merits, then a preliminary injunction cannot be granted. *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir.1987).

## III.   DISCUSSION

As observed previously, a preliminary injunction is an extraordinary remedy, one that should be ordered only in limited cases, upon a compelling showing. That showing has not been made in this case. For the same reasons this Court outlined in its denial of Plaintiffs' request for an emergency temporary restraining order, Plaintiffs fail to meet the first and second requirements for a preliminary injunction: a likelihood of success on the merits and a showing that they will suffer irreparable harm. To meet the requirement of likelihood of success on the merits, the movant must show a "reasonable probability" of success. *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980) (internal quotation marks omitted); *see Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (*en banc*). To meet the irreparable harm requirement, "the irreparable harm must be actual and imminent, not merely speculative." *Angstadt ex rel. Angstadt v. Midd-West Sch.*, 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). Further, "the claimed injury cannot merely be possible, speculative or remote." *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 809 (W.D. Pa. 1995). Plaintiffs do not meet either requirement.

### A.   IRREPARABLE HARM

"'In general, to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Leone v. Essex*

*Cnty. Prosecutor's Off.*, No. CV2112786SDWESK, 2021 WL 4317240, at *7 (D.N.J. Sept. 23, 2021) (quoting *State Trooper Fraternal Ass'n v. New Jersey*, Civ. No. 08-3820, 2008 WL 4378343, at *4 (D.N.J. Sept. 23, 2008). "[T]he irreparable harm must be actual and imminent, not merely speculative." *Angstadt ex rel. Angstadt v. Midd-West Sch.*, 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). "[T]he claimed injury cannot merely be possible, speculative or remote." *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 809 (W.D. Pa. 1995).

Plaintiffs provide no support for their conclusion that the Properties' current vacancy will result in "pipes freezing or fires" that "threaten[] irreparable harm for neighboring residents and countless others." (Doc. 6, at 25).[2] In fact, the harm surrounding the Properties' vacancy to neighbors is entirely speculative, as Plaintiffs cite no evidence or reason to believe that the Properties are at-risk for creating a fire or otherwise impacting neighboring people or properties. Further, Plaintiffs may access the Properties during the day so long as they provide notice to the Borough. (Doc. 16, at 15; Doc. 19, at 8). Indeed, Plaintiffs *have* accessed the Properties to remove belongings. (Doc. 19, at 8). Plaintiffs also provide no support for their assertion that Rabbi Hellinger's inability to access the Properties impairs his religious freedom, ability to act as a religious leader to others, or others' freedoms. Defendants are not refusing to allow Rabbi Hellinger to practice his religion in any manner or gather with members of his congregation in any location other than the Properties. (Doc. 19, at 90). Plaintiffs concede that they have been able to secure temporary alternative locations to gather to study Torah and engage in religious activities. (Doc. 19, at 90). While Plaintiffs testified

---

[2] The Court recognizes that Plaintiffs do not argue that the risk of frozen pipes is the sole source of irreparable harm. (Doc. 19, at 3). Plaintiffs framed the case during the hearing on this motion about religious freedom rather than property damage. (Doc. 19, at 3). However, because Plaintiffs argue the property issues their brief, the Court addresses it here. (Doc. 6).

that the temporary or alternative locations do not allow for the same level of participation or consistency, the Court does not find that such imperfections show "irreparable harm." (Doc. 19, at 90); *See Leone*, 2021 WL 4317240, at *7. Thus, Plaintiffs provide no basis for their conclusion that they will surely and immediately suffer the harm they anticipate because of the Properties' condemnation. (Doc. 6).

Importantly, Plaintiffs have refused to engage in any sort of efforts to compromise or come to a resolution with the Borough. For example, in the Borough's communications to Plaintiffs and Plaintiffs' present and former attorneys, Defendants repeatedly suggested actions for Plaintiffs to take that would bring them in compliance with local ordinances and even offered Plaintiffs instructions about how to apply for exceptions to the relevant Zoning Ordinances. (Doc. 16-6, at 2; Doc. 16-7, at 2-3; Doc. 16-8, at 2-4; Doc. 16-10; Doc. 19, at 13, 153). Plaintiffs either did not respond to the Borough's communications or refused to engage. (Doc. 19, at 13, 153). Such a refusal to engage in communications with defendants to resolve civil liberties concerns dilutes a plaintiff's irreparable harm argument. *See Leone*, 2021 WL 4317240, at *7 (finding no irreparable harm when "[p]laintiff refused to meaningfully engage in any type of compromise before filing suit based solely on his own testimony that he has been 'forced to forgo a prayer practice' by not being able to work from home") (citations omitted).

First Amendment claims require a particularly sensitive irreparable harm analysis. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). However, even this broad standard requires a showing that First Amendment freedom was lost. Here, as will be discuss; *see also Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607 (D. Md.

9

2023), *aff'd,* No. 23-1567, 2023 WL 8728503 (4th Cir. Dec. 19, 2023) (finding no irreparable harm when a plaintiff received a citation for violating a zoning law that restricted his First Amendment freedom to use A-frame signs outside a Planned Parenthood because plaintiff was able to continue protesting in other ways); ed *infra*, Plaintiffs do not make a sufficient showing that Defendants demonstrated any kind of religious animus. Plaintiffs have conceded that they are able to practice their religion in alternative locations during the pending litigation. Thus, Plaintiffs have not shown irreparable injury even under the First Amendment standard. *See Leone*, 2021 WL 4317240, at *7 (holding that there is no irreparable injury when a local prosecutor office refused to allow an employee to work from home indefinitely in order to pray aloud in nature, an alleged requirement of plaintiff's religion, when plaintiff made no efforts to engage in compromises or consider alternative options offered by defendants).

Our sister courts in other Circuits have similarly found no irreparable harm in analogous circumstances implicating the First Amendment. In *Tree of Life Christian Sch. v. City of Upper Arlington*, the court denied a preliminary injunction to plaintiffs seeking to use a property as a religious school where the zoning laws prohibited the land's use as a school, holding "one who purchases property to use as a school knowing that the use as a school is not permitted does not suffer irreparable harm." No. 2:11-CV-009, 2011 WL 13311862, at *15 (S.D. Ohio Apr. 27, 2011). In *San Jose Christian Coll. v. City of Morgan Hill*, the court found the plaintiff could not show that the city's denial of the plaintiff's use of the property for religious or education use harmed the plaintiff, a private Christian religious education institution, where the plaintiff had other locations it could use for religious/educational activities and stating plaintiff's "predicament is largely of its own making, having prematurely

announced its plans for the new college campus prior to securing the necessary approval to use the site. No. C01-20857, 2001 WL 1862224, at *7-8 (N.D. Cal. Nov. 14, 2001).

Plaintiffs have alternative locations, albeit imperfect ones, at which they can host religious and educational activities. (Doc. 19, at 90). They have refused to engage in any efforts to communicate with Defendants about the dispute, despite being given instructions on how to secure legal use of the Properties as educational religious facilities. (Doc. 19, at 8-10). Finally, Plaintiffs' contention that there is a fire risk or that pipes will freeze absent a preliminary injunction is speculative and unfounded, especially given that Plaintiffs may enter the Properties before 6:00 PM and after giving the Borough notice. (Doc. 6, at 25; Doc. 16, at 15; Doc. 19, at 7-8). Accordingly, Plaintiffs have not shown that they will suffer irreparable harm absent a preliminary injunction.

B.    SUCCESS ON THE MERITS

The Court turns next to Plaintiffs' likelihood of success on the merits, and notes the "flexible" approach endorsed by the Court of Appeals for the Third Circuit, which requires courts to consider the factors "taken together," such that a plaintiff who shows great harm has leeway to show less success on the merits, or a plaintiff who shows less harm must show a high likelihood of success on the merits to warrant a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017); *see also Northampton Cnty. Democratic Party v. Hanover Twp.,* No. CIV.A.04-CV-00643, 2004 WL 887386, at *11 (E.D. Pa. Apr. 26, 2004) (denying a preliminary injunction request when plaintiffs' failed to show irreparable injury in a First Amendment case despite the fact that they successfully showed some likelihood of success on the merits); *see Doe v. Hill Sch*., No. CV 23-1210, 2023 WL 2868016, at *3 (E.D. Pa. Apr. 10, 2023) (denying a preliminary injunction after finding only

a "small likelihood" of success on the merits and noting "[h]aving not found a likelihood of success on the merits, [the court] will only briefly address the remaining factors."); *Word Seed Church v. Vill. of Hazel Crest*, 533 F. Supp. 3d 637, 647 (N.D. Ill. 2021) ("the [c]ourt applies a 'sliding scale' approach under which 'the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position.'") (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)).

To establish a reasonable probability of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. *Punnett v. Carter*, 621 F.2d 578, 582-83 (3d Cir. 1980). The district court must examine the legal principles controlling the claim and the potential defenses available to the opposing party. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if the evidence clearly satisfies the essential prerequisites of the cause of action. *Highmark*, 276 F.3d at 173. In this case, Plaintiffs' twenty-one causes of action can be generally categorized in two groups: (1) religious discrimination claims; and (2) due process violations. (Doc. 6, at 12-23; Doc. 16, at 10-11). The Court will address the likelihood of success for each group in turn.[3]

---

[3] Plaintiffs also bring claims pursuant to the Fair Housing Act ("FHA"), the Fourth Amendment, and § 1985 conspiracy claims. Neither party discusses the merits of these claims in their briefs, and accordingly, the Court assumes that Plaintiffs do not move for a preliminary injunction based upon on these particular claims. (Doc. 6; Doc. 16).

### 1.    Religious Discrimination Claims Lack Merit

In relevant part, the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I.  The Religious Land Use and Institutionalized Persons Act ("RLUIPA") states, in pertinent part, as follows:

> "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, [. . . ], unless the government demonstrates that imposition of the burden on that person, assembly, or institution-- (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000cc.

RLUIPA similarly prohibits restrictions that treat religious groups on less equal terms than nonreligious groups, restrictions that discriminate based on religion, and restrictions that totally exclude or unreasonably limit religious assemblies, institutions, or structures. *See* 42 U.S.C. § 2000cc. Finally, the Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause does not require that all persons be treated alike, but rather directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The parties agree that the seminal issue for Plaintiffs' religious discrimination claims, asserted under RLUIPA, the First Amendment, and the Equal Protection Clause, all require this Court to determine if Plaintiffs can show evidence that the Zoning Ordinance restricts their freedom of religion in some way, that Defendants' actions were somehow motivated by animus, or that Plaintiffs were treated differently than similarly situated individuals based

upon their religion. (Doc. 6, at 13-21; Doc. 16, at 10-11).[4] Plaintiffs have not established any of these scenarios.

Initially, the Court must determine the appropriate standard of review for Plaintiffs' religious discrimination claims. *See Leone*, 2021 WL 4317240, at *3. Here, the Zoning Ordinance is facially neutral, as schools, dormitories, and even houses of worship are only some of "numerous uses which are not specifically permitted uses," 100 F. App'x at 76, and the purpose of the zoning law at issue is not to regulate free exercise or speech but to, in relevant part, "promote, protect and facilitate" [. . .] "health, safety, […] general welfare, coordinated and practical community development, proper density of population,[. . .] vehicle parking and loading space, [. . . and] schools." KINGSTON, PA., ZONING ORDINANCE, art. 1, § 102 (2023). Accordingly, Defendants need provide only a rational basis for the restrictions under a First Amendment analysis. *See Lighthouse Inst. for Evangelism Inc. v. City of Long Branch*, 100 F. App'x 70, 76 (3d Cir. 2004) (applying rational basis review to Zoning Ordinances that prohibit certain religious land uses and finding that such restrictions are constitutional so long as the government acts in accordance with a legitimate regulatory interest).

In other words, Zoning Ordinances that exclude educational facilities, such as yeshivas, houses of worship, or dormitories do not violate federal equal-protection rights or freedom of religion rights. Though every citizen has a fundamental right to exercise their

---

[4] Plaintiffs' RLUIPA claims and his constitutional claims that implicate religious discrimination and religious freedom will all be analyzed together, as each requires a showing that Defendants placed a burden on Plaintiffs' freedom of religion, and if the burden exists, that Defendants acted in furtherance of a compelling interest, or, in the case of an Equal Protection claim, that the Borough demonstrated religious animus. *See Thompson v. Smeal*, 54 F. Supp. 3d 339, 352 (M.D. Pa. 2014) (holding that under RLUIPA and the First Amendment, a plaintiff must satisfy an initial burden showing that the government burdened his religious freedom before requiring the government to show that it acted in furtherance of a compelling interest).

religion freely without burdens, the Constitution grants municipalities broad authority to regulate zoning. *See Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 135 (3d Cir. 2002) ("federal courts have given states and local communities broad latitude to determine their zoning plans. Indeed, land use law is one of the bastions of local control, largely free of federal intervention."); *see also FERC v. Mississippi*, 456 U.S. 742, 768 n. 30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity.").

As discussed *supra*, Plaintiffs can and have practiced their religion in alternative locations and may, but have not, apply for a variance to use the Properties as a school, dormitory, or house of worship. (Doc. 19, at 47-48, 90, 95, 99). There is no convincing evidence that Plaintiffs' freedom of religion is legitimately burdened. Further, even if they had shown such evidence, the Zoning Ordinance is the least restrictive manner of furthering a compelling government regulatory interest in health and safety, as is noted as the purpose for the Zoning Ordinance both in its text and through the testimony of the Borough Solicitor, Attorney Mattern. (Doc. 19, at 117, 142, 154); *see* KINGSTON, PA., ZONING ORDINANCE, art. 1, § 102 (2023); *see also Congregation Kol Ami*, 309 F.3d at 136 (holding that "we do not believe land use planners can assume anymore that religious uses are inherently compatible with family and residential uses" and describing the conflicting interests of religious freedom with regulatory zoning interests such that "[a] necessary corollary of the extensive zoning authority bestowed upon local municipalities, including the authority to create exclusively residential districts, is the authority to make distinctions between different uses and to exclude some uses within certain zones."). The Zoning Ordinance, coupled with Defendants' clear instructions to Plaintiffs regarding steps to take to apply for a variance, is the least restrictive means of achieving this interest. (Doc. 1-3, at 2-3; Doc. 1-6, at 2). There is no evidence that Defendants

15

enforce their Zoning Ordinances to an unreasonably strict degree. In fact, Defendants waited over a year to enforce the Zoning Ordinance through condemnation while they attempted to work with Plaintiffs to bring the Properties into compliance. (Doc. 1-3, at 2-3; Doc. 1-6, at 2; Doc. 19, at 12-13, 15). To conclude that Defendants should be more lenient in enforcing the Zoning Ordinance would be to conclude that the Zoning Ordinance is wholly unenforceable so long as any individual claims that the ordinance violates his or her rights, even without evidence of such infringement.

Further, Plaintiffs have not established that Defendants treated religious groups differently than secular groups or other similarly situated religious groups. To the contrary, the Zoning Ordinance applies zoning procedures equally to all groups. *See* KINGSTON, PA., ZONING ORDINANCE (2023). Just as a secular group would have to apply for a variance or special use permit to use a property in a manner other than that which is permitted under the zoned commercial zone, Plaintiffs must apply for such a variance or special use permit. (Doc. 19, at 16). Plaintiffs have presented no evidence that Defendants targeted solely religious properties that did not comply with Zoning Ordinances.

Finally, Plaintiffs cannot show that Defendants' actions were motivated by animus. To the contrary, the evidence in the record suggests that Defendants attempted to compromise and work with Plaintiffs for a year prior to condemning the Properties. (Doc. 1-3, at 2-3; Doc. 1-6, at 2; Doc. 19, at 12-13, 15). Defendants set up meeting with Plaintiffs and their attorneys and communicated with Plaintiffs repeatedly to explain how to apply for a variance and zoning relief. (Doc. 1-3, at 2-3; Doc. 1-6, at 2; Doc. 19, at 12-13, 15). Plaintiffs did not make any efforts to engage with the processes to apply for a zoning variance, such as a Special Use Exception, instead opting to argue that such applications were unnecessary, as the Properties

were not schools or dormitories, but an office and a home.[5] (Doc. 19, at 47-48, 90, 95, 99).

Regardless of the precise language used to describe the Properties, Plaintiffs have not established that Defendants exhibited or acted with any religious animus or discriminatory intent and as such, cannot show a likelihood of success on the merits regarding the religious discrimination claims at this juncture. *See Terzian v. Montclair Hosp., LLC*, No. CV224396ESESK, 2023 WL 2473454 (D.N.J. Mar. 10, 2023) (denying a preliminary injunction where plaintiff could not show she was likely to succeed on the merits of her discrimination claims when she did not show discriminatory intent); *Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376 (M.D. Pa. 2021) (finding plaintiffs are unlikely to succeed on religious discrimination claims when plaintiffs could not make out a *prima facie* discrimination case); *431 E Palisade Ave. Real Est., LLC v. City of Englewood*, No. 219CV14515BRMJSA, 2023 WL

---

[5] Plaintiffs' argument that the Properties are not used as a school or dormitory flies in the face of common sense and the evidence in the record. While Plaintiffs insist that a yeshiva is not a school, the evidence in the record, including photographs of the properties, clearly show rooms set up as classrooms, with white boards and books. (Doc. 16-5, at 2; Doc. 16-12; Doc. 16-19). Plaintiffs' own website refers to the Properties as a "yeshiva" or a place of learning. Black's Law Dictionary similarly defines a school as "an institution of learning and education" or place where "instruction is given." School Definition, *Black's Law Dictionary* (12th ed. 2024). Plaintiffs' website encourages "students" to apply and discusses the presence of "teachers," all staples of what is considered a school. Further, other federal courts have defined "yeshiva" as a school. *See Rutstein v. Avis Rent-A-Car Sys.*, Inc., 211 F.3d 1228, 1231 (11th Cir. 2000) ("Webster's Third defines a 'Yeshiva' as 'a school for advanced Talmudic study.'" (quoting *Webster's Third New International Dictionary* 2651 (1993)); *Israel v. Avis Rent-A-Car Sys., Inc.*, 185 F.R.D. 372, 375 (S.D. Fla. 1999), *rev'd sub nom. Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000) ("The word "yeshiva" is defined in The Random House Dictionary of the English Language (Unabridged Edition) as follows: 1. an Orthodox Jewish school for the religious and secular education of children of elementary school age. 2. an Orthodox Jewish school of higher instruction in Jewish learning, chiefly for students preparing to enter the rabbinate.").

6121195, at *7 (D.N.J. Sept. 19, 2023) ("[p]laintiffs' failure to allege discriminatory intent is fatal to their equal protection claim").

### 2.    Due Process Claims Lack Merit

The Court next considers whether Plaintiffs' procedural and substantive due process claims show a likelihood of success on the merits. "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). To establish a prima facie case of a procedural due process violation, a plaintiff must show: (1) there has been a deprivation of the plaintiff's liberty or property, and (2) the procedures used by the government to remedy the deprivation were constitutionally inadequate. *See Studli v. Children & Youth Families Central Reg'l Office*, 346 F. App'x 804, 813 (3d Cir. 2009); *Mulholland v. Gov't of Cty. of Berks*, No. 10-CV-5616, 2012 WL 1057446, at *8 (E.D. Pa. Mar. 29, 2012), *aff'd*, 706 F.3d 227 (3d Cir. 2013). Remedial procedures will be deemed constitutionally inadequate if "they contain a defect so serious [as to] characterize the procedures as fundamentally unfair." *See Leonard v. Owen J. Roberts Sch. Dist.*, No. 08-CV-2016, 2009 WL 603160, at *4 (E.D. Pa. Mar. 5, 2009) (citing *Daniels v. Williams*, 474 U.S. 327, 341 (1986) (Stevens, J., concurring)). In other words, "the focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." *K.S.S. v. Montgomery Cty. Bd. of Comm'rs.*, 871 F. Supp. 2d 389, 397-98 (E.D. Pa. 2012). "The process that is 'due' in a given situation necessarily differs based on the particular circumstances." *Maple Props., Inc. v. Twp. of Upper Providence*, 151 F. App'x 174, 177 (3d Cir. 2005) (citations omitted).

The Eastern District recently explained:

> In the context of property deprivations, the United States Supreme Court "has never employed an actual notice standard in its jurisprudence. Rather, its focus has always been on the procedures in place to effect notice." *United States v. One Toshiba Color Television*, 213 F.3d 147, 155 (3d Cir. 2000). Thus, "[d]ue process does not require that a property owner receive actual notice before the government may take his property." *Jones v. Flowers*, 547 U.S. 220, 226 (2006). It mandates only that notice be "reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Flowers*, 547 U.S. at 220 (holding that notice is "constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent."). The Supreme Court has explained that if, for example, notice sent by certified mail is returned unclaimed, the municipality must "take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." *Flowers*, 547 U.S. at 225. The Court recognized that such steps could include resending the notice by regular mail, addressing otherwise undeliverable mail to occupant, or posting notice on the front door. *Flowers*, 547 U.S. at 236-37.

*Madar*, 2021 WL 2156362, at *8.

Due process requires: (1) the government provide notice to the property owner reasonably calculated to apprise interested parties of the pendency of the action; and (2) afford them an opportunity to present their objections. *Gordon v. City of Phila.*, No. 07-5039, 2009 WL 2710247, at *3 (E.D. Pa. 2009) (citing *Flowers*, 547 U.S. at 220). "A plaintiff cannot prevail on a Fourteenth Amendment procedural due process claim if the state has an adequate post-deprivation procedure or remedy available." *Olarte v. Cywinski*, No. 3:12-CV-632, 2012 WL 3757649, at *5 (M.D. Pa. Aug. 28, 2012) (citing *Revell v. Port. Auth. Of N.Y. & N.J.*, 598 F.3d 128, 139 (3d Cir. 2010)). An adequate procedural due process remedy is when a state provides "reasonable remedies to rectify a legal error by a local administrative body." *Olarte*, 2012 WL 3757649, at *5 (quoting *Perano v. Twp. of Tilden*, 423 F. App'x. 234, 237 (3d Cir.2011)).

Here, Plaintiffs complain that "[t]here is a facially-evident lack of due process in this matter." (Doc. 6, at 14). Plaintiffs contend that such a lack of due process is evidenced by several of Defendants' actions, including not notifying Plaintiffs of their opportunity to appeal the determination letters; closing down Plaintiffs' Properties; not offering an opportunity to appeal the condemnations; and broadly "abusing their authority compared to the Zoning Ordinance's prescribed enforcement remedies." (Doc. 6, at 14-15).

However, as noted above, Defendants attempted to resolve the matter amicably and communicated to Rabbi Hellinger repeatedly about what he would need to do to get a variance for the Properties. (Doc. 1-3; Doc. 1-4; Doc. 1-6; Doc. 1-7; Doc. 16-13; Doc. 16-15; Doc. 16-6, at 2; Doc. 16-7, at 2-3; Doc. 16-8, at 2-4; Doc. 16-10). Specifically, the first and second violation notices for both Properties explain that each is noncompliant with the Zoning Ordinance and explain how to file an application for a hearing and how to apply for zoning relief in the form of a Special Exception or a Conditional Use permit. (Doc. 1-3, at 2-3; Doc. 1-6, at 2). Both violation notices for both Properties state that they were issued "in accordance with Section 1201.2.k of the Ordinance." Section 1201.2.k states:

> "In the event of a violation of this Ordinance, provide written notice to the person responsible for such violation, indicating the nature of the violation and ordering the action necessary to correct the violation. Such written notice may be served personally or by certified mail. Corrective action may include an order to cease and desist the illegal use and/or activity of land, buildings, signs, or structures; or to remove illegal buildings, structures, additions, signs, and/or structural alterations."

KINGSTON, PA., ZONING ORDINANCE, art. 12, § 1201.2.k (2023).[6]

---

[6] Section 1205 of the Zoning Ordinance seems to contradict Section 1201.2.k by requiring that the Zoning Officer include in the notice of violation that the recipient has the right to appeal and request a hearing. *Compare* KINGSTON, PA., ZONING ORDINANCE, art. 12, § 1201.2.k (2023) *with* KINGSTON, PA., ZONING ORDINANCE, art. 12, § 1205 (2023). It is undisputed that the violation notices provided to Plaintiffs by Defendants did not include the

The violation notices comply with Section 1201.2.k. (Doc. 1-3, at 2-3; Doc. 1-6, at 2). The Court thus finds that Rabbi Hellinger was afforded actual notice of the Borough's intent to restrict access to the Properties if he did not bring them into compliance with the Zoning Ordinance. (Doc. 1-3, at 2-3; Doc. 1-6, at 2). The Court recognizes, however, the contradictions in the requirements in the Zoning Ordinance concerning appeals *Compare* KINGSTON, PA., ZONING ORDINANCE, art. 12, § 1201.2.k (2023) *with* KINGSTON, PA., ZONING ORDINANCE, art. 12, § 1205 (2023).

To the extent that Plaintiffs' due process claims set forth a post-deprivation procedural due process claim, the Court finds that such claim does not present a likelihood of success on the merits because Plaintiffs have not availed themselves of the remedy available for condemnation through state systems. *See Florimonte v. Borough of Dalton*, No. 3:CV-14-0341, 2014 WL 3114071, at *14 (M.D. Pa. July 7, 2014), *aff'd*, 603 F. App'x 67 (3d Cir. 2015) (dismissing Fourteenth Amendment procedural due process claim where plaintiff failed to avail herself of adequate state law post-deprivation remedies available); *see also Perano*, 423 F. App'x at 237-38 (dismissing procedural due process claim for failure to take advantage of a reasonable state remedy under the Eminent Domain Code). Plaintiffs have state law remedies available and could also challenge the zoning violations through the procedures laid out in the violation notices, namely by applying for a hearing or for zoning relief. Plaintiffs may not use the federal courts as a means to circumvent the procedural process made available to them. *See 3909 Realty LLC v. City of Philadelphia*, No. CV 21-0030, 2021 WL 2342929, at *6 (E.D. Pa. June 8, 2021) (dismissing plaintiffs' procedural due process claim finding that

---

particular language notifying Plaintiffs of their right to appeal, but the notices clearly set forth the procedure by which Plaintiffs could come into compliance with the Zoning Ordinance.

plaintiffs did not avail themselves of procedural protections afforded by City of Philadelphia because no actions were taken to contest an impending demolition). Plaintiffs have not shown a sufficient likelihood of success on the merits for a procedural due process claim, as Rabbi Hellinger received actual notice of the impending condemnation and failed to avail himself of the zoning relief process prior to and after the condemnation.

The substantive component of the Fourteenth Amendment Due Process Clause bars certain arbitrary and wrongful government actions that deprive an individual of life, liberty, or property. U.S. Const., amend. XIV § 1; *see also Tazioly v. City of Phila.*, No. 97-CV-1219, 1998 WL 633747, at *7 (E.D. Pa. Sept. 10, 1998) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). The first step in assessing a substantive due process claim is to identify the constitutional interest that was allegedly aggrieved. *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). In order to successfully make out a substantive due process claim in the context of local land use regulations, "a plaintiff must establish as a threshold matter that he has a property interest protected by the Fourteenth Amendment's due process clause." *Maple Props., Inc. v. Twp. of Upper Providence*, No. 00-CV-4828, 2004 WL 2579740, at *2 (E.D. Pa. Nov. 12, 2004) (citing *Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179-80 (3d Cir. 1997)). Here, Plaintiffs own the Properties that were affected by Defendants' actions relating to the Zoning Ordinance and condemnation, establishing the presence of a property interest entitled to due process protection. *See Maple Props.*, 2004 WL 2579740, at *2 (citing *DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell*, 53 F.3d 592, 600 (3d Cir. 1995)); *see also Cherry Hill Towers, LLC v. Twp. of Cherry Hill*, 407 F. Supp. 2d 648, 654 (D.N.J. 2006) ("As owner of the Cherry Hill Towers property, Plaintiff clearly has a property interest protected by due process.").

The second step in the substantive due process analysis is ascertaining whether the identified property interest has, in fact, been aggrieved by the government. *Maple Props.*, 2004 WL 2579740, at *2. Government action does not violate substantive due process when merely prompted by an "improper motive." *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006). Rather, the standard for determining substantive due process violations is whether government action rises to the level of "shocking the conscience." *United Artists Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). While there is no "calibrated yard stick" upon which to measure such conduct, the United States Supreme Court has recognized that "only the most egregious official conduct" qualifies. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 847 n.8 (1998)); *see also Cherry Hill Towers*, 407 F. Supp. 2d at 655.

Plaintiffs fail to identify evidence of conscience-shocking behavior in Defendants' Zoning Ordinance or its approach to the Properties. The Supreme Court has observed that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (quotation omitted). "[T]he public interest demands that all dangerous conditions be prevented or abated," and, thus, inspections of private property designed at ensuring compliance with certain safety standards are not unconstitutional. *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 537 (1967); *see Win & Son*, 162 F.Supp.3d at 459. Evidence in the record establishes that the Properties implicate safety concerns, as discussed *supra*, including exposed electrical wires, a lack of supervision for kids, dangerous construction that left gaping holes in the floor in the basement, and garbage and trash improperly disposed of. (Doc. 16-5, at 2; Doc. 16-12; Doc. 16-19). On several occasions, the

Borough's Zoning Officer notified Plaintiffs of his health and safety concerns and that they had received ongoing complaints about the Properties' safety issues from neighbors. (Doc. 16-6, at 2; Doc. 16-7, at 2-3; Doc. 16-8, at 2-4; Doc. 16-10). In demolition proceedings, which more severely implicate property rights than mere condemnations, courts have found that "given unsafe structures," city-led demolitions cannot "shock[] the conscience." *Harmon v. Sussex Cty.*, No. CV 17-1817-RGA, 2019 WL 4344635, at *7 (D. Del. Sept. 12, 2019), *aff'd*, 810 F. App'x 139 (3d Cir. 2020) (citing *Davet v. City Cleveland*, 456 F.3d 549, 552 (6th Cir. 2006) (affirming district court's holding that plaintiff's substantive due process claim failed because he could not establish that municipal actions taken pursuant to a valid condemnation order and in accordance with the procedures mandated by city and state law shocked the conscience or were arbitrary and capricious)).

Because this Court has not found that Plaintiffs would suffer irreparable harm absent a preliminary injunction, Plaintiffs need to show a higher level of likelihood of success on the merits to warrant the extraordinary relief of such a preliminary injunction. *Reilly*, 858 F.3d 173. This Court has not found that Plaintiffs are likely to succeed on their religious discrimination claims or substantive due process claims. Further, the Court sees only a very slight likelihood of success for Plaintiffs' procedural due process claims, due to the conflicting nature of the Zoning Ordinance provisions. Accordingly, Plaintiffs do not meet their burden required to show the necessity of a preliminary injunction.

C.    THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST PLAINTIFFS

The Court, in an abundance of caution, now looks to the remaining factors of a preliminary injunction request. *Reilly,* 858 F.3d 173. Neither favors Plaintiffs. Whether granting preliminary relief will result in even greater harm to the nonmoving party or other

parties weighs in favor of the Defendants because if the preliminary injunction were issued it would inarguably dilute the purpose and procedures for zoning laws, a squarely local governing responsibility, as well as other local ordinances. *See Congregation Kol Ami*, 309 F.3d at 136. Rabbi Hellinger explained that his adherence to Judaism is unique because his interpretation of Jewish law defines prayer and religion as embedded in all activities he engages in, all the time. (Doc. 19, at 18). Rabbi Hellinger testified that everything he does, from sleep and eat to study Torah, he considers a religious activity. (Doc. 19, at 18-25, 43). According to Plaintiffs' logic, a zoning law or any other local ordinance that impairs or limits *any* activity that Plaintiffs would like to engage in necessarily infringes on their freedom of religion. An invalidation of the relevant Zoning Ordinance based on this assumption would imply that any religious group could skirt any law with which it disagrees. Such a loophole would surely result in great harm to local governments attempting to effectuate and promote safety and health interests in its municipality. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988) ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires").

Additionally, the evidence in the record shows that the Properties present a safety concern. Photographs submitted show trash and hot plates that are left out in unfit locations, accessible to children without any clear adult supervision. (Doc. 16-5, at 2; Doc. 16-12; Doc. 16-19). Defendants further presented evidence that Plaintiffs have begun construction of a Mikvah, a large pool of water in which Jewish purification rituals are performed, in the basement of one of the Properties. (Doc. 19, at 10, 84, 117). A basement that opens into a large hold in the ground, without stairs, could certainly be considered a danger to the children and younger adults living there. This presents a harm to not only the individuals living in and

frequenting the Properties, including children, but also presents a harm to Defendants, who are tasked with keeping the public and children safe from fire hazards and other safety concerns. Such a hardship outweighs Plaintiffs' concerns presented with minimal concrete evidence. *See Grill*, 908 F. Supp. 2d at 591. Finally, neighbors of the properties have complained to Defendants, citing unsupervised children and potential fire and safety hazards. For these reasons, granting the preliminary injunction would not be in the public interest. *See Grill*, 908 F. Supp. 2d at 591.

In sum, Plaintiffs have failed to show irreparable harm that outweighs the risk of harm to Defendants or the public interest. The only factor that weighs in favor of Plaintiffs is that they have shown a slight potential for success on the merits of the procedural due process claim. However, alone, this is not enough for the extraordinary relief of the issuance of a preliminary injunction. *See Northampton Cnty. Democratic Party*, 2004 WL 887386, at *11 (denying a preliminary injunction where no irreparable injury was established, even where the other factors weighed in favor of issuance of the injunction); *Newark Branch, N.A.A.C.P. v. Millburn Twp., N. J.*, No. CIV. A. 89-4219, 1990 WL 238747, at *11 (D. N.J. Dec. 27, 1990) (denying a preliminary injunction where plaintiffs did not establish a probability of irreparable harm, even where they did show a likelihood of success on the merits); *New Jersey Staffing All. v. Fais*, No. 1:23-CV-2494, 2024 WL 4024090, at *7 (D.N.J. Aug. 30, 2024). Accordingly, Plaintiffs' motion for a preliminary injunction will be **DENIED**.

D.    THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

In addition to the claims brought pursuant to the United States Constitution, Plaintiffs bring certain claims under the Pennsylvania state constitution and state law. (Doc. 1). Where a district court has dismissed all claims over which it had original jurisdiction, the Court may

decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose,* 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been addressed and disposed of and only state law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill,* 484 U.S. at 350. Here, the Court has not found a preliminary injunction appropriate regarding any of the claims over which it has original jurisdiction. Therefore, declining to exercise supplemental jurisdiction over the remaining state law claims, a preliminary injunction will not be granted on state law grounds.

## IV.    CONCLUSION

Pursuant to the foregoing, Plaintiffs have failed to establish irreparable harm or that they are likely to succeed on the merits of most of their claims. Consideration of the remaining factors relevant to the issuance of a preliminary injunction also weigh in favor of denying the injunction. As such, Plaintiffs' motion for a preliminary injunction (Doc. 5) will be **DENIED**.

An appropriate Order follows.

Dated: December 19, 2024                                s/ *Karoline Mehalchick*
                                                                         **KAROLINE MEHALCHICK**
                                                                         **United States District Judge**